Good morning. My name is Paul Turner. I'm with the Federal Public Defender Office for the District of Nevada. I'm representing Joni Golden, the appellant in this case. I'd like to reserve two minutes for rebuttal, if I might please. As the Court is well aware, there are lots of issues that a COA, Certificate of Appeal Ability, was granted in this case. I'd like to, personally, I'd like to emphasize a couple of them this morning, but most importantly, I'd like to respond to where the Court would like me to go. Otherwise, I'll start with what I, at least, would like to present and to see where that leads. First of all, Ms. Golden was convicted of a crime she didn't commit. Our position is that under Nevada Statute 205.130, to be convicted of passing a bad check, you have to have either insufficient funds, lack of property, or lack of credit. The case was pled against her in the amended information solely on the basis of lack of sufficient funds. We don't contest that. She certainly lacked sufficient funds. We contend, of course, that she had credit. She had credit because she had a check guarantee agreement with the Nevada Federal Credit Union. It was an indictment or information? It was an amended information, Your Honor. She's not a third-party beneficiary of that arrangement. All it says is the bank will honor a check without double-checking with the bank. It doesn't say whether the check's going to clear or not. It doesn't say it's going to be charged against her account. Well, Your Honor. That's the agreement. So how can you say she has credit? She has a line of credit of $500, and she had about $22 available to cover the five checks, right? I think that's correct, Your Honor. And that's it. So she didn't have credit. The bank had notified her. First of all, one response would be, as we argue, that if you look at the statements of account, and obviously Your Honors have all looked at them closely, if you look at the statements of account, you'll see that there are advances, advances, credit advances that are on those accounts. Now, that's what the bank treats them as, credit advances. Whether they, however, for whatever reason they do that, those are credit advances that are going into her account and that are used to pay back those checks. The bank treats it as credit. And I'm — our argument is that it is credit. The bank treats it as credit in those statements. They may argue later — Her account balance is a negative. There's no doubt about that, Your Honor, at all. Well, then it's not a credit to her account. The bank is — my only argument would be, Your Honor, is the bank is entitled — To the bank's loan account. The bank is entitled to give extra credit if they want to do that. They would extend her a letter of credit. Or they would extend her — they would increase her loan account to $1,000 or whatever it took. That's correct. If that's what the bank was intending to do. They did that. And they paid every one of those checks. So the payee on those checks lost money. Do you have knowledge of the ability to write checks in excess of $500 and the bank would cover? That had been happening before, Your Honor. There were earlier statements, and I believe the December statement shows some advances. I'm not — I don't think the word credit is in that statement, but it certainly shows some advances. There had been earlier bad checks, and that — and they had been paid. So as far as I know, no payee was out any money, and that had happened before. Now, I can't say that Ms. Golden read every statement she got. I think we can assume that she should have read the statements and that she's supposed to read the statements. The — when it gets to the Nevada Supreme Court, their opinion reviews only the lack of sufficient funds. They never mention the word credit. They act as if the statute doesn't even have the word credit in it. It was properly briefed to them. It was not information, right? The information just says not sufficient funds. That's correct. So — I think it was a defective charge. So is that your claim, that she was charged with something that's not a crime? Well, she was not charged completely under the statute. She was charged partially under the statute. And the proper way to charge it, I believe, would be to allege that the defendant lacks sufficient funds, property, or credit. And if you can prove that, I think you've convicted somebody of a bad check. They didn't allege that. But you are — right, you are confusing or you are mixing up charge and proof. The charge, the information, says not sufficient funds. Right. And as I understand it, what you're arguing is not having sufficient funds by itself is simply not a crime. Not if you have credit. That's correct. Not if you have credit and she had credit. But it's not a crime. No. It's not a crime. Because it has to be the absence of funds plus the absence of credit that makes a — that makes a crime. That's correct. So essentially she was — one element was omitted. One element was omitted? So where does that take you? Let's say, in fact, the proof of trial is that there was no credit. I'm sorry, that there was no credit? Let's say the proof of trial had been that she had no credit. Yes. The only way the bank would honor her checks is by if she had funds in there. Is the fact that the information does not mention credit, does that — is that a defective charge? It's a good question, Your Honor. I believe you should amend it. It should be amended. I think it normally would be amended liberally. Did you — I think there's a need to amend that. I don't think you can be convicted — I'm sorry, Your Honor. Is the complaint attacked or the charge attacked at the trial court? Well, before you answer Judge Bezos' question, could you answer my question? I think you cannot be convicted unless there's an amendment to that. Properly convicted unless there's an amendment to the information to make it correct. I don't think you can be convicted of a crime you weren't charged for in a trial. I think you have to be properly charged to be convicted. And I don't think that's — I think that's an incomplete charge. I think it could be amended and probably liberally would be, but there was never any motion to amend it that I'm aware of. But at the same time, not to get to Judge Bezos' question, there was no objection raised to that. I don't believe there was, Your Honor, no. And it wasn't exhausted in a state court? No. It wasn't? No, except to the extent it relates to the other side of the coin, obviously, that the evidence — in our judgment, at least, the evidence didn't prove that she lacked credit. Indeed, I think the evidence proves she had credit. And I think the bank gave her credit. Let's just get on to that position. She had a zero balance, or she had no funds in her account, right, $22? I think it was $22, I believe. At that point, that first check on January 18 was written. I think it was $22, if I'm not mistaken. Okay. And then she had a check guarantee card, which you treat as a line of credit. Correct. So if you write a check, if she had written checks up to $522, they would have been covered by the bank. She would know that they'd be covered by the bank. Correct. How much did the checks amount to, the five checks? I mean, it's $400 and — excuse me, it was $567, I believe, Your Honor. I should have that right here. Are they felonies or misdemeanors? The different checks? Yes. Under the law, the checks were passed in 1988. At that time, it was $100 or more. It was a felony, and all the checks were $100 or more. Okay. However, however, excuse me, Your Honor, in 1989, before she was arrested and or prosecuted, the statute was amended to make $250 a felony. None of the checks were a felony in 1989 on. None of the checks are a felony today. In the aggregate, they would have been one felony because there's a $500 aggregate figure. These checks, I believe, were $567 and some change. But it doesn't matter because — I was enraged. Because Nevada applies the law at the time of the act. Well — So amendments to the statute are nonretroactive. If it was a crime which committed the act, the fact that by the time she got to trial, the law would change wouldn't do her any good. Your Honor, you may be correct on that. We argue, or attempt to argue at least, that the Nevada saving clause doesn't, or saving statute, doesn't control that the change in the law was not a superseding law, but it was a reclassification of what a felony is and a misdemeanor, and that that would apply at the time that the prosecution occurs. If we make that argument, I don't know that there's any clear-cut law on that. I cite a couple of cases from other areas. But, you know, I think that's a debatable subject, though. And our view, at least, is that it was simply a reclassification and that she was entitled to the benefit of that. And — So if we take the 522 that she had in — no, did she have any other checks against that? There were some subsequent checks, I believe, Your Honor. The ultimate number here was somewhere over $3,000. It was — that passed — I think the final figure was something between $3,000 and $4,000. For checks. Not in the charging, but — These were subsequent checks. Yes. There may have been a few prior, too, that ended up in that figure. But I think there was some prior, some afterwards, that ultimately totaled that number. There was no prosecution for those checks. So — Well, let's see what I'm trying to figure out. The stuff that happened afterwards doesn't really affect the case. Checks that she issued beforehand does affect it. I mean, if you issue 10 checks, five of which amount to $567, but you also have out there another five checks that also amount to $567, then when you write your checks, you have to write — you have to consider not only what funds are in the account, but also how the funds are going to be treated by the checks. So you can't sort of meld them together. How many checks has she written before these five, and how much were they worth? No, Your Honor, I'd have to look at those statements of accounts and then apologize. I don't have that right in front of me. I'll be happy to look at that. Let's see if we can come up with that. There in the excerpts of record commencing basically about page 61 or 2. On excerpt of record page 64, Your Honor, there is a — it's the December statement, end of December. And it lists — let's see. Were all of them? Oh, yes. On the second — I'm sorry, Your Honor, on page 65, there are a number of checks listed there. Apparently from 1224, there are about five or six checks listed there where they were returned, according to this statement. I think there's six, I believe. So those would have been returned prior to the events in January. Well, I'm not sure. But those were checks that were returned. Right. So they could no longer count against the credit limit. What I'm wondering is at the time she writes these checks, the five for which she was prosecuted, she had a certain amount of cash in her account. She had a certain amount of credit in her check guarantee card. But she also had some checks out there that hadn't come in. Right. So in figuring out whether she has sufficient funds or credit, you have to add up all the checks that might come in and make a claim on that $522. So when she wrote those five checks, what else was floating out there? I think those six were — Well, those six had come back. Yes, they had. I guess they could be put through again. Is that what it is? I honestly don't know if there were any others that were out there before. The January statement — And why weren't these honored if she had a line of credit? The December ones. As far as I know, all the checks were paid by the bank, Your Honor. I'm not aware of any payee losing a cent. So the bank had a pattern here of paying checks that were returned. Whatever they may have said to her or not said to her, they paid the checks. And I hate to reiterate, but that's — our position is that that's credit. If my bank's putting money out for my checks, they're giving me credit. They can call it what they want. That's credit. That's giving me credit. But the crime occurs, as I understand it, at the time she writes the check. If she writes the check and passes it, and in her mind she knows for a fact that there's no money in the account, then the fact that the check comes in, maybe the bank officer looks at it and says, Oh, you know, this customer is good. Even though there's no line of credit, we'll honor the check. And I'm sure she's going to sometimes do that as a courtesy. I would assume that's still a crime under Nevada law. You wrote the check not having funds, not having credit. The fact that the bank then chooses this amount of grace to honor the check anyway doesn't undo that, does it? Well, except the caveat I would have would be the bank calls this advancing the line of credit. That's their term, advancing the line of credit. I'm with you up to the 500. Right. But they call these additional payments they make advancing the line of credit. In other words, that's what they call them on their statements, advancing the line of credit. And that's what their employee testified to at the trial, advancing the line of credit. Obviously, when the bank decides to honor it, they're not making a gift. Banks are not in the business of making gifts of money. They sometimes make gifts of toasters or clocks or things of that sort, but they're definitely not in the business of making gifts of money. So, of course, they would consider it when they honor a check when there are no funds there, they consider it an ad hoc advance against the next deposit you make or, you know, it's sort of a loan. It's an ad hoc loan. Your Honor, not to interrupt you, they also use the same phrase later. They say transferred from the line of credit to clear one of the checks. They consider a line of credit to still exist, obviously. That's their terminology. And that being my only point, I totally agree with what you're saying. Obviously, they're not doing this as a gift. They charge her. And she still gets statements that show monies on her account. That's still an account. They're sending her statements. It sounds like she didn't have a great lawyer at trial, does it? Well, I don't know, Your Honor. Maybe hindsight, you know, is always better. You know? But I – She was sent by counsel, right? I'm sorry, Your Honor. She represented herself. Yes, she did. No, you're right about that. I haven't had a client yet that did well by themselves, but maybe I'll run into one soon. But I haven't seen one yet. They all do seem to do poorly. Can I – I'm sorry, Your Honor. Could I mention a counselor? I see plenty who do poorly as lawyers, too, so. Yes, I agree with that, Your Honor, and I wouldn't want to exclude myself. Hopefully, I won't be in that position. Can I just real quickly say that this sentence she got is a violation of the Eighth Amendment. It – Ms. Golden was no angel. I wouldn't come before this Court and pretend she was. But Ms. Golden didn't deserve to get five life sentences, two of which were consecutive, a 20-year-to-life sentence. You don't get any good-time credits off that. That's an important thing to know. When you have a life sentence, you don't – they calculate good-time credits, but you get none. How do we – in deciding that, how do we take into account the commutation? How do you – does that factor in? Yeah. Yeah. I think that's just a – that's a fact. It happened. But she's still serving lifetime parole. This constitutionally wrong sentencing structure, the results of that are still being paid for by her. She's not a free person. She's earned freedom. She spent almost 12 years in prison, 11 to 12 years. She's been a model person on parole. I saw her two days ago, I'm happy to say. She earned her freedom. She won't have her freedom unless something happens here. She will still be on parole the rest of her life. After 10 years, you can apply to have it changed, but there's no certainty that'll ever happen. She has to report to parole officers on a regular basis. That's wrong. That shouldn't be the case right now. Do you think maybe the reason she's done so well on the outside in contrast to the way she did before she went in is that she does have this hanging over her head? Your Honor, I think – Sometimes people need a little help. I totally agree, Your Honor, but at some point you've earned the right to have freedom again. And if you don't screw up to have freedom again, you've earned it. You're right. I totally agree with you that what's happened here may well have been helpful to her. But some people can't handle it. That's right. But once you pay your price in our society, you've earned your freedom back. And that's what I would say. My final comment would be – and I've got to get out of here. Are you sure she wants out? She wants out of that parole. I know that, Your Honor. And she's doing fine. Yes. Yeah. She wants out of that parole. She – no one wants you on parole the rest of your life. The judge here intended for her to get five years. She wrote a letter to the Pardons Board. Well, if he really did, he would have written a different letter to the Pardons Board. I think the judge – If that's what he meant, he would have written a letter supporting her rather than opposing her. So I don't think he can make too much of that letter. I think she miscalculated, Your Honor. She thought she was giving her something that would have kept her in five. She was in 11 to 12. She's paid her price. Thank you very much. I doubt that a judge gets five life sentences and thinks the person's going to get out of five years. I find that hard to believe. I understand that, Your Honor. Thank you. Okay. I'm going to give you some time for rebuttal. Thank you. Good morning. May it please the Court. My name is Vic Schulze. I'm the Senior Deputy Attorney General of the State of Nevada. If I could address some of the Court's questions. You're absolutely right, Your Honor. There was $22 left in that line of credit at the point when these checks started coming in. I'm sorry. I thought there was $22 of cash left in the account. No. A bank examiner, or I think she called herself a collections person, a woman by the name of Ayers, testified. And she testified that this account had only been open a couple months. This account was opened in November, I think November 12th of 1987. There were three aspects of the account. She opened it with some money. She also opened a savings account at that time with a few dollars in it. And she got this $500 line of credit. She also got a check guarantee card. The very next day, on the 13th of November, that $500 line of credit was approved. She emptied it out the day it was approved completely, according to Ms. Ayers. She had put some money back in. How was it emptied out? I don't know. What the exact testimony was from Ms. Ayers was that the ‑‑ what she said was on the same day, on November 13th of 1987, the defendant advanced the full amount out of the line of credit. And the line of credit at that point, by my reading of Ms. Ayers' testimony, went down to nothing. Between January 5th of 1988 and January 12th of 1988, 14 checks were presented for about $2,000. No deposits had been made to the account. All of those were returned on January 12th of 1988. The checking account at this point in time was now in the negative because the bank was charging fees for the bad checks. And I think it's $20 per fee. So the checking account at that point in time was in the negative for fees. The checking account was closed by the bank on January 12th of 1988. Was she advised of that fact? She was sent a letter. It's questionable whether or not she received the letter. I would suggest, though, that had she done her legal duty and known what was in that account and known the status of that account as she continued to write checks, she would have known that fact. What you say is disputed. Did she receive the letter or not? The letter was sent to her, and my recollection of the record was that the return receipt requested card was not signed. But the bank made the effort to send that to her at the address that they had when they closed the account. Nor is there any other evidence in the record that she received it. On the closure of the account? Yes. I'm not aware of any. What we do know from the record is that the account was closed prior to these checks clearing. These checks started, I think they were dated, on the 18th of January, and I think they went for about five days. They were all sent to, they were cashed at a grocery store. Some were cashed for cash, a store called Alpha Beta in Las Vegas. Some were cashed just for cash, and some were in exchange for groceries. The difficulty I think that counsel has with his argument on the credit is I think he's confusing, and I think the courts mentioned this issue. He's confusing the issue of the check guarantee card with a line of credit. When these checks were coming in, prior to that, prior to the account being closed, there was $22 of money left in the line of credit, and there was nothing or a negative balance in the checking account. The bank was obligated to the merchant to pay those checks whether or not there were funds in the account because that's the way the check guarantee cards work. And the benefit, obviously, to these credit union employees is that they know that they at least can cash because of that check guarantee card. But Ms. Harris was very clear that the bank never, it was not part of the contract for that amount ever to go over $500. Toward the end of January, the last, the ending balance in January showed. I'm not sure I understand the point of this. If she writes the check and she's got the check guarantee card, and she knows for a fact that the bank will honor it because the check guarantee card is there, it sounds to me like that's sufficient funds. Whatever the bank chooses to call it, that's an ad hoc loan to her for that amount. They guarantee, they say, we will pay the check. You write the check, you pay for it. So whether you call it a line of credit or not, that's what it is. It's certainly not writing a check with not sufficient funds. You've got the entire bank behind it. The problem is the bank becomes the victim in this kind of case. It's called unsecured creditor. And putting people in prison for debt has been abolished in this country since about 1865. If the bank has a problem with it, they need to cancel that card. They need to pull the card. But so long they've got that civil obligation out there, all we're talking about is increasing a civil debt. We do not in this country send people to prison for debt. This prison was abolished. Absolutely. So you've got a big problem here. You've got a problem where you've got checks being written, the bank stands behind them, actually pays them, the people who are taking the checks, know they're not relying on Ms. Golden's face or credit or personal integrity or anything else. They're relying on the bank, and the bank has done enough to give this person its guarantee. So I can't understand how you could possibly put somebody in prison on five consecutive terms for welching on a debt. I don't think the state courts here have covered themselves with glory. I must say, all the state prosecutors have covered themselves with glory. The issue here from our standpoint is that it's threefold. The checks were covered. Any dispute about that? The checks were covered and Alpha Beta, the grocery store, was not victimized. Exactly. But who was victimized here was the bank, and I would And the bank was victimized pursuant to its agreement, its contract, with Ms. Golden. And the contract was only for $500. I'm sorry? The contract was only for a $500 line of credit, and the line of credit was essentially Plus the check guarantee card. They said we will cover any check you write, and if you write the check, you owe us the money. Now, of course the check guarantee card doesn't come into play unless you don't have money in the account. The whole point is we will honor it whether you have money in the account or not. If I could respectfully disagree, I don't think that's the point of a check guarantee card. The point of a check guarantee card in this day and age is to show the store or the merchant that there's something behind. It's a real checking account. There's something behind that account. I think there's a distinction between I'm sorry, which part don't you understand? Is it check or guarantee? There's a distinction, I think, between the line of credit and the check guarantee card. I guarantee, you know, let's say you go up to Dutch Carney and you say, I'd like to borrow $500. And he's the kind of guy that might make a loan like that. He says, but look, I don't know you, Mr. Schultz. I don't know you. How am I going to pay you back? And I say, not to worry. I guarantee it. And he lends you the money, right? But what if I lied to him, though, and I never intended to pay him back? You're out the $500. I am out the $500, and that's my contract with you, and I then become an unsecured creditor in your Chapter 13. That's my bad luck. There's no fraud involved because I, in fact, you say Kaczynski guarantees that I will pay it back. And that's true. Now, if you lie about the fact that I guarantee it, then, of course, you've got a different problem. But there's no doubt about the fact that the people who took the checks were correctly told the bank guarantees it. And they were paid. Now, you might have a problem. You and I might have a problem at that point, and I might say, gee, you know, I guarantee this for you. You looked like a nice young man, you know, home-rimmed glasses and everything, and it turns out you waltzed on your dad. Absolutely. But I can't break your legs over that, can I? You can't what? You know, send somebody to break your legs over it. Hopefully. No, I mean, you know, no, no, no, no. Well, we're in San Francisco. No, no, I'm just saying there are various things I'd like to do to somebody who waltzes on their dad, but the law limits me in the things. I can't use violence against you. I can't kidnap your children. You know, I can't do anything like that. And what I certainly cannot do is send you to death sentence prison. What we at that point have is a civil dispute, you and I. I have to take you to a small claim court. I have to tell them the whole sad story about Judge Connolly giving you money and my being the guarantor. And at that point, the judge will say, oh, Mr. Schultz, you better pay that. That's the same circumstance. There's no difference between your set of facts and your. There's no way you could go to prison is what I'm pointing out. But there's no difference between your set of facts and if there had been no check guarantee card used in this case, and Ms. Golden went to Alpha Beta, wrote out the check, Alpha Beta could also, had they been victimized, they also would have had a claim in small claims court and bankruptcy in the same. Oh, no, no, no, no, no, no, no, no, no, no. The whole point of these laws is that people who take the checks are protected. Okay, because they are not extending credit. They are giving the equivalent of cash, and that's a check. That's why you have these statutes. That's why these statutes work despite the 13th Amendment. But the person that stands behind the check, which is the bank, is just a creditor. It's just a creditor. They entered the consensual relationship, banking relationship. They were dumb enough to give this person a check guarantee card in the line of credit. They could have checked her out. They could have asked for collateral. They could have asked for a lien on her house. They could have asked for her to bring in large quantities of gold and put them in the safe to hypothecate them. They could have done all of those things to protect themselves, but they didn't. What they did is they said, here, honey, you've got a check. You've got a line of credit, and what's more, we're going to guarantee $500 worth of your checks so that if you pass a check to somebody, they are going to get paid, and they did. It's not a crime. What it is, is you're nevada-tying to put somebody in prison despite the 13th Amendment. Very bad stuff. I'd point out one important fact we haven't discussed yet. We fought a civil war over this. I'm sorry? We fought a civil war over this. One important fact here is that in the charging document, the bank was alleged in the alternative to be a victim.  Ever been to bankruptcy court? I'm sorry? Ever been to bankruptcy court? I have. They all consider themselves victims. Every single creditor considers themselves a victim. Oh, they are so victimized. My God, they're so victimized. But you know what? Bankruptcy judges can't put people in prison most of the time. Understood. Understood. But the question that remains is, what if Joni Golden intended to cheat the bank? And I know you're under your ---- I want to keep the issue of the check guarantee part different. If she intended to cheat the bank, she might, the bank, you might be able to prosecute her for fraud against the bank, but not for bad check passing. That's a different law. That was how the fraud, that's how the fraud was perpetrated in this case, though. It's not bad check passing. If you want to charge her with fraud and the way the fraud was perpetrated is by passing these checks, that would be fraud. But you didn't charge her with fraud. You charged her with the wrong crime. But the DA's office charged the methodology of using the bad check and the bank was named ---- Was it a fraud? Was a fraud one of the charges? Intended to fraud is one of the elements of the crime. And the bank was named ---- Elements of the crime was ---- but the crime was passing bad checks. But one element of that crime is intended to fraud and the bank was named as one of the victims in the alternative in the charging document. You can't turn a civil debt into a criminal charge by saying that essentially a loan is now passing a bad check. I'm amazed you guys put this woman in prison for 12 years over this when every single check was paid for. If you wanted to charge her with defrauding the bank, then you had the responsibility to charge her with that, not with this other crime that she obviously didn't commit. I'm just flabbergasted. Counsel, did the bank put into evidence any agreement with respect to the card? Is there a written agreement between the bank and the depositor? I don't recall from my review of the record that anything specific on the ---- Is there an agreement between the merchants of the city and the bank as to what those cards mean? Is there anything in evidence? I don't think there's anything in the record on the issue, no. So it's completely silent as to whether there's a debtor-creditor relationship triggered by the use of the card, right? Between ---- The bank and the card holder. Not the store or the person referring to it. To my recollection, if I'm understanding your question correctly, there's no evidence in the record. I don't think Ms. Ayers, who was the primary witness on this issue, testified on the issue of a debtor-creditor relationship and the fact that the check guarantee card was a form of credit. No. The credit in this case is just a line. You're digging yourself deeper. So it was a gift. It was a gift, then. Paying the checks off? Yes. I don't think ---- You don't have proof it was a loan. They paid the money. How do we know it wasn't a gift? I'm sorry? As you said earlier, we may get a toaster from these folks, but I don't think they're going to give us money. So I don't think ---- I don't know. Banks in Nevada, you know, in Nevada, you guys put people in prison for debt. So I don't know what you do there. Wait a minute. Let's go back to the law school definition of a gift. What was delivered? To whom? In this, the checks were given to the store, and the checks were not covered by the person who wrote the check out. So the bank had to cover the check, and the bank then in that case ---- The merchant delivered some paper to the bank, and the bank delivered some money to the merchant. It's not the person that was charged with the crime that delivered anything to anybody except the check. Except ---- For which there was no funds in the bank, right? There were no funds in the bank. Okay. Except my, except Ms. Golden got the $100 in cash a couple times. No, no, no, no. And she got the groceries. No, but that's not quite right. I mean, she had a check guarantee card that said the bank would cover the check. Right. Now, Judge Beaz, I asked you a question. You said, geez, there was no, nothing to show that when they did that, this was a loan. Okay? It was never defined by the bank. It doesn't mean that they wouldn't cover the check. We do know they would cover the checks because it said that. Yes. And since you don't have evidence it was even a loan, it could have been a gift. Maybe they did it for her for nothing. Since you don't have any evidence in the record that it was a loan. I mean, the absence of evidence that it was a loan doesn't help you at all. In your case, it might actually prove that that bank was very generous and made a gift. But at worst it was a loan even if you don't have evidence. Right? I mean, it's not going to be anything else. Let me ask. Since they advanced the money, right, they either made a gift of it or they made a loan. Either they expected to be paid back or not. Those are the two possibilities. I think in the theory of the original prosecuting agency, they were covering a bad debt after the crime had been committed. The crime was committed when that check was passed knowing there was no money in the line of credit. What crime? What crime is committed when you pass a check and you know that when the check gets to the bank, the person who receives the check will get the money? What crime is being committed at that point? The crime is your intent not to pay with your funds or your $500 line of credit. That's where the crime took place. So I think this is different than a civil action. And the intent here was at the time that check, those checks were written, at that moment. So what you're saying is that the check guarantee card was not an additional $500 line of credit. I don't think it was a line of credit. Even though the bank was advancing the money and even though it expected your client, I'm sorry, opposing counsel's client, to make it good, what do you call it when you advance money for somebody and you expect them to pay back? I'm sorry, what do you call it when you advance money for somebody and then you expect them to pay you back? What do you call that? In this kind of case, according to Ms. Ayer's testimony, that was not a loan. That was the testimony. What do you call it when you advance money? Let's say, for example, you don't have money for bus fare and you want to take the bus. And I say, never mind, I'll buy you a ticket. You send me the money back. What have I done vis-a-vis you? In your instance, you've given me a loan. But those facts are a little bit different than what we have here, I think. I'm sorry. You're saying there are circumstances where I pay for somebody, I expect them to pay me back, and it's not a loan? Because in your case, you're – I mean, I suppose there's a gift. I mean, there's a possibility that I do it and say, never mind, it's only bus fare, you keep it. But the difference is, in your case, you're giving me the money and I'm riding the bus. No, no, I'm giving the money directly to the bus driver. I'm putting in a slug and I get charged with cheating the bus company. And then after the fact, you come in and say, I will cover you and I'll pay the bus company back. But that's after the fact. That's not simultaneous. No, because at the time you pay the check, the people who take the check know that this is covered by the bank. That's what the check guarantee card does. Yes, at that point, that's correct. So the fact that I'm there to say, that's okay, let him ride the bus, I'm good for it. At that point, I've made the loan, and the reason they let you get on the bus is not because you have a nice face, but because they know I've got money and I'm going to cover you. So whatever beef there is is a beef between you and me and not between you and the bus company or me and the bus company. But the difference here is there's a relationship. That check guarantee card forms a relationship between the bank and the store in this case. That relationship is separate from the fact that Joni Golden wrote checks knowing she didn't have any money in the account and didn't have sufficient funds in that line of credit because she emptied it out the day after she got it. You know, I think I understand your position. I don't know if there's reason. Well, in essence, the bank is buying bad paper, right, from the store, and they're charging the customer a late fee, an NSF fee, whatever other fees they can tack onto it plus monthly interest on an unpaid balance, right? There are lots and lots of fees in this case. Yeah, that's the way they work. Thank you. Just unless the Court has other questions for me, I did want to make one statement I intended to make previously. I didn't want to overstate any of the facts in this case. There was a question about the letter sent to Ms. Golden, the first letter in January. There is evidence in the record that it was a certified letter, but after going back through the record to prepare for today, I have some doubts that that letter was certified. The letter that was certified later was sent to a Las Vegas address but received in California, not Las Vegas, but California. And counsel very candidly acknowledged, and I appreciate that, that it's questionable whether she received that first letter, and I think that's absolutely clear. But I wanted to be sure of the Court that I didn't overstate something in the record. Thank you. At the trial of the criminal case, did the defendant introduce her balance checkbook from date to date to date? Your Honor, I don't believe she did. And that's not there? She just didn't keep a checkbook? I honestly don't know if she kept one or not. I hope she did, but I can't say that she did. I don't believe that's in the record. If it is, it's something I haven't seen. Explain if there was an exhibit. I don't think it is, Your Honor, but I'd be happy to check. And if I find that, if the Court would be interested in that, I'll get that for you. Have you petitioned for a pardon? What she received, she was able to get on to parole, you know, through the Pardons Board, basically on her own initiative, which is fairly amazing, frankly, with some help of a volunteer lawyer. She hasn't tried for an additional pardon to get off lifetime parole. Obviously what happens in this case might determine whether that should be done, and that's something to think about. She does have a right after 10 years on parole to ask to be released, but she's had almost five years on parole. Any chance of settling this case? I tell you, if she could just be, I'd have to talk to the client, obviously. If somebody would come up and say that they would support her release from parole, I'd sure take that to her and talk to her about it. No one's done that so far. Well, you know, you've all heard what we had to say here. I must repeat what I said, and I'll speak only for myself. I don't think the courts of Nevada cover themselves with glory in this case in a number of respects, a number of issues raised, some of them barred, some of them not barred, but it was not anything that the judges of Nevada ought to be proud of. And I, for one, would not, whether this is a win or a loss, it's not something that I would want my Nevada colleagues to be proud of seeing in print. Or the state of Nevada. Any chance that the governor might be induced to say enough's enough and let her off parole and we can avoid the difficult 13th Amendment question and all those things? I'm just being serious. If it's not realistic, we'll just go ahead and do what we're going to do. I started reading between the lines of the court's comments. If we had more than just a few weeks, perhaps, before the decision came down, I'd be happy to chat with counsel. Well, we can certainly hold off a decision if we think there is. You know, we always try to. . . We would refer it to our mediation service. The bench wouldn't have anything to do with it. We would simply do nothing. We would be involved. And so long as you were actively pursuing it, we would be happy to hold off any decision. At this point, I certainly have some authority over this case in our office. Well, why don't we do this for starters? And our mediation office is really very good. And perhaps what you ought to do is go see Mr. Lombardi in this building on your way out. We'll put this case on hold for deferred submission for one week to give you a chance to think about it, check with your supervisors, and think about it. And if you think there is something fruitful going on, what we'll expect is a letter in a week letting us know where it is. If you think you can, we will simply put things on hold. We don't get involved in the process. All we do is do nothing. If you honestly think it can't be done, then we'll go ahead and make a decision. I don't know what the decision is going to be. That's what those are encouraging. I have a couple of questions. Find Mr. Lombardi. He's somewhere in the building here. After you see Lombardi, he'll communicate with us if he thinks that there's any possibility of working with you. Go to him. Go to him, and he will do it himself, or he will assign one of his mediators. They are very good, and they do handle criminal cases. They even managed to mediate a death capital case one time. Thank you, counsel, both were very good. I know we're giving a little hard time, but I find I get most of the lawyers when, and I appreciate the answers on both sides. If this can be resolved, that would be good. Submission deferred for a week.
judges: Beezer, Kozinski, Carney